STATE OF CONNECTICUT *v.* DARYL H. BUNKLEY
(12597)

PETERS, C. J., HEALEY, DANNEHY, CALLAHAN and CELOTTO, Js.

Argued November 4, 1986—decision released March 24, 1987

*Jon L. Schoenhorn,* with whom were *Kathleen A. Murrett* and, on the brief, *Jamil Simon,* law student intern, for the appellant (defendant).

*Michael E. O'Hare,* assistant state's attorney, with whom, on the brief, were *Warren Maxwell,* assistant state's attorney, and *Robert Kiley,* law student intern, for the appellee (state).

DANNEHY, J. The defendant, Daryl H. Bunkley, appeals from convictions and sentences on various counts of a substitute information containing six counts. The first count charged the defendant with engaging police in pursuit in violation of General Statutes § 14-223 (b); the next three counts charged the defendant with manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3);[1] and the fifth and sixth counts charged the defendant with assault in the first degree in violation of General Statutes § 53a-59 (a) (3).[2] The charges had as their basis a collision between two automobiles in East Hartford on August 13, 1982, that caused the deaths of three persons and injuries to two others.[3] A jury found the defendant guilty of engaging police in pursuit, and of so much of the information as charged him with manslaughter in the second degree and assault in the third degree. See General

---

[1] "[General Statutes] Sec. 53a-55. MANSLAUGHTER IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person. . . ."

[2] "[General Statutes] Sec. 53a-59. ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person. . . ."

[3] The evidence pointed to the defendant, who is a black male, as the driver of one of the automobiles involved in the collision. This activated an unsuccessful motion to dismiss the prosecution on grounds of selective enforcement of the criminal law. The ruling was not challenged.

Statutes §§ 53a-56, 53a-61.[4] The court imposed a sentence of unconditional discharge on the first count. The defendant received an effective sentence of imprisonment for twenty-two years for the manslaughter and assault convictions. Only the judgment with respect to the manslaughter and assault counts are here on appeal.

The defendant urges seven assignments of error. Specifically, he contends that the trial judge erred in: (1) refusing to grant the defendant's motions for judgment of acquittal; (2) permitting the state to charge him with and the jury to convict him of manslaughter and assault under the facts of this case; (3) refusing to permit the defendant to cross-examine two police officers concerning their knowledge of a civil suit filed against them on behalf of the victims of the accident that gave rise to the charges filed against the defendant; (4) refusing to disqualify the office of the state's attorney after it was disclosed that a member of that office formerly represented the defendant in criminal matters; (5) excluding, as irrelevant, evidence of a speed survey conducted by police at the scene of the accident; (6) failing to instruct the jury properly on the defendant's state of mind; and (7) sentencing him to consecutive terms of imprisonment for several deaths arising from a single automobile accident.

The evidence adduced at trial showed that on August 13, 1982, Jean Hopkins was working as an assistant manager at Billy Four, a clothing store in the Charter Oak Mall on Silver Lane in East Hartford. She

---

[4] "[General Statutes] Sec. 53a-56. MANSLAUGHTER IN THE SECOND DEGREE: CLASS C FELONY. (a) A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

"[General Statutes] Sec. 53a-61. ASSAULT IN THE THIRD DEGREE: CLASS A MISDEMEANOR. (a) A person is guilty of assault in the third degree when . . . (2) he recklessly causes serious physical injury to another person . . . ."

was on duty around noon when she observed a man crouching between the clothing racks in the store. Hopkins approached the man and asked him whether he needed help. The man answered that he did not need assistance, and walked quickly toward an exit. Hopkins then noticed a laundry bag on the floor near where the man had been standing. When examined, the bag contained seventeen pairs of jeans that had been removed from the clothing racks. Hopkins subsequently identified the defendant as the man in the store.

At about the same time, Susan Johnson, the manager of Billy Four, was on her way out of the store when she overheard the conversation between Hopkins and a man she later identified as the defendant. As she returned to meet with Hopkins, she saw a bag at the man's feet and observed his hasty departure. After Johnson told Hopkins to push the "panic button," she followed the defendant out of the store and into a parking lot. She saw him enter a brown Lincoln automobile and then drive off at a high rate of speed. In the parking lot she caught sight of a police officer sitting in a parked police vehicle. Before she could reach the officer to report the incident, he was driving away. Meantime, back at the store, Hopkins had pushed the panic button to activate a system designed to signal the East Hartford police department. No signal was given. The system was disconnected. Testimony at trial established that the police did not learn of the episode in Billy Four until after the defendant's arrest.

Officer Richard Rohner of the East Hartford police department testified that as he sat in his standing police vehicle in the Charter Oak Mall at approximately noon on August 13, 1982, he noticed a brown Lincoln automobile going at a high rate of speed through the parking lot over to Forbes Street. Rohner immediately followed the car and saw it turn south onto Forbes Street without stopping for a red light. At this time

Rohner signalled the operator of the Lincoln to stop by turning on a siren and flashing blue lights. The driver failed to stop. As Rohner proceeded south on Forbes Street he saw the Lincoln pass through a red light and turn west onto Silver Lane. Rohner pursued the Lincoln and while doing so radioed for assistance. Officer Patricia Topliff of the East Hartford police department heard Rohner's call and joined the ensuing chase on Silver Lane.

Silver Lane is a four-lane highway which runs generally east and west. It is undisputed that the defendant was proceeding westerly, that at the same time Eleanor Mitchell was operating a motor vehicle easterly along Silver Lane, and that traffic was heavy in both directions.

Rohner testified that he pursued the defendant at rates of speed ranging up to sixty miles per hour. A witness, Thomas Saggio, testified that he was travelling west in the left lane of Silver Lane when the defendant's vehicle passed him on the right, cut over into the left lane and struck his vehicle. Other witnesses testified that the defendant swerved back and forth in the westbound lanes, at one time going off the road, and then over the center line between the east and westbound lanes. Another witness driving easterly testified that the defendant was straddling the center line and missed his car by inches. A passenger in that vehicle saw the collision of the defendant's car with the Mitchell vehicle in the rear view mirror. That witness testified that the defendant's car crossed over the center line of the highway into the eastbound lane and struck the other vehicle head on. The defendant admitted that at the moment of impact he was operating the Lincoln at a speed of sixty to seventy miles per hour. Eleanor Mitchell and her daughters, Anne Marie and Sharon, who were passengers in her vehicle, were killed. Her son Todd and his friend, William Luchon, who were also riding as passengers, were seriously injured.

Each count of manslaughter in the substitute information charged that the defendant, under circumstances evincing an extreme indifference to human life, recklessly engaged in conduct which created a grave risk of death to another person and thereby caused the death of another person. See General Statutes § 53a-55 (a) (3). Each assault count alleged that under similar circumstances the defendant's reckless conduct caused serious physical injury to another person. See General Statutes § 53a-59 (a) (3). The crimes as charged included the elements that constituted the lesser included offenses of manslaughter in the second degree and assault in the third degree. See General Statutes §§ 53a-56 (a) (1), 53a-61 (a) (2).

Prior to trial, the defendant moved for a bill of particulars and in response thereto the state filed a bill specifying that the reckless manner in which the defendant operated a motor vehicle, so that the lives and safety of the public might be in danger, consisted of the operation of said motor vehicle at an excessive rate of speed, improper passing, and the operation of said motor vehicle on the wrong side of the road.[5] The

[5] The bill of particulars alleged that:

"(1) On August 13, 1982, between 11:45 a.m. and 12:15 p.m. the defendant drove a 1972 Lincoln Continental in a southerly direction on Forbes Street, then proceeded in a westerly direction on Silver Lane. During his course of travel he engaged two East Hartford police officers in a pursuit. During his course of westbound travel on Silver Lane, he operated his vehicle recklessly, under circumstances evincing an extreme indifference to human life and created a grave risk of death to other persons, to wit:

"(a) he engaged police officers in a pursuit;

"(b) he drove his car at extremely high and excessive rates of speed considering the heavy traffic conditions which existed at the time;

"(c) he heedlessly passed other vehicles on the highway in a weaving-type manner;

"(d) after striking two vehicles, (on one of which the defendant was on the wrong side of the road), he failed to stop his car and continued his flight from the police and once again crossed the center line into the eastbound lanes of Silver Lane where he crashed head-on with a smaller vehicle, causing the death of the automobile operator and the death of two of its passengers.

"(2) Same as No. 1. The severe impact to the eastbound vehicle further caused serious physical injuries to two other occupants of that automobile."

response appears to have satisfied the defendant. At no time thereafter did the defendant move for a supplemental bill of particulars, nor did he request a statement of the essential facts claimed to constitute the offenses charged. See Practice Book § 625.

After the close of the state's case-in-chief, the defendant filed a written motion for a judgment of acquittal. The motion was denied. At the close of all the evidence, the defendant again moved for a judgment of acquittal. The trial court reserved decision on the motion and submitted the case to the jury. After the jury returned guilty verdicts on the lesser offenses of manslaughter in the second degree and assault in the third degree, the court denied the motion. Prior to the imposition of sentence, the defendant filed motions for a new trial, for acquittal, and in arrest of judgment. Each motion was denied.

I

We first consider the defendant's second allegation of error wherein he contends that the state's attorney improperly charged him with the crimes of manslaughter and assault. The defendant argues that the prosecutor exceeded his authority by charging the defendant with the "generic" crime of manslaughter in contravention of a legislative scheme to treat motor vehicle homicides in a specific manner. He further argues that the manslaughter and assault statutes under which he was tried and convicted are unconstitutionally vague as applied to him. We reject both aspects of this contention.

A

A comparison between the former Connecticut law relating to the crime of homicide and the law as it currently exists will be helpful in understanding the issues involved in this assignment of error and the basis of our decision.

Homicide under former Connecticut law was of two kinds, murder and manslaughter. See General Statutes (1902 Rev.) § 1140 et seq. Murder was classified into two categories, murder in the first degree and murder in the second degree, and our statutes expressly defined the types of conduct which constituted murder. See General Statutes (1902 Rev.) § 1140.

Manslaughter was not statutorily defined. See General Statutes (1902 Rev.) § 1143. It is fair to presume, there being nothing to indicate the contrary, that it was the legislative intention to borrow the common law definition of manslaughter. This assumption comports with our principle of statutory construction that technical words which "have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly." See General Statutes § 1-1.

Manslaughter in the words of Zephaniah Swift is the unlawful killing of another, without malice, express or implied, and may be either voluntary upon a sudden heat of passion, or involuntary in the commission of some unlawful act, or negligently in doing a lawful act. Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 305. Our case law divided the crime of manslaughter into two categories, voluntary and involuntary manslaughter. The crime of involuntary manslaughter historically included vehicular homicide. Whoever caused death because of "culpable negligence," "gross negligence," or "recklessness" in the act of operating a motor vehicle was subject to punishment under the manslaughter statute. See *State* v. *Block,* 87 Conn. 573, 89 A. 167 (1913); *State* v. *Goetz,* 83 Conn. 437, 76 A. 1000 (1910); *State* v. *Campbell,* 82 Conn. 671, 74 A. 927 (1910). Frequently, these various degrees of negligence eluded exact definition and often were used interchangeably. See, e.g., *State* v. *Campbell,* supra, 677.

In 1918, the legislature enacted stringent and detailed provisions respecting vehicular homicide. General Statutes (1918 Rev.) § 6191 provided in relevant part that "every person operating a motor vehicle upon the highways of this state, who shall, in consequence of his intoxication or of any gross or wilful misconduct or negligence, cause any loss of life . . . shall be fined . . . or imprisoned . . . or both." Even after enactment of § 6191, however, persons were still charged with involuntary manslaughter, if the circumstances surrounding the vehicular homicide were particularly egregious. See *State* v. *Carty*, 120 Conn. 231, 180 A. 287 (1935).

The defendant acknowledges that, in the past, persons were indeed charged with the common law crime of involuntary manslaughter for operating a motor vehicle so as to cause death. He points out, however, that common law crimes were abolished following the adoption of our penal code in 1969, and further points out that our penal code contains specific sections pertaining to death caused by improper operation of an automobile; see General Statutes §§ 53a-56b, 53a-57 and former § 53a-58a (now § 14-222a); and our motor vehicle laws provide rules for vehicle use of the highways. See, e.g., General Statutes §§ 14-219, 14-222, 14-232. The defendant contends that these statutes ought to be interpreted in such a way as to indicate a clear legislative intent to render a person criminally liable for a vehicular homicide only in accordance with these statutes, and to preclude prosecution under other criminal statutes.

The penal code made significant changes in our criminal law. Manslaughter is now statutorily defined and is classified into two categories, first and second degree manslaughter. The mental states required for the commission of each category of manslaughter are specifically defined. See General Statutes § 53a-3 (11) and

(13). The code also distinguishes reckless from criminally negligent conduct. A person acts *recklessly* if he is "aware of and *consciously disregards* a substantial and unjustifiable risk," and "acts with 'criminal negligence' . . . when he *fails to perceive* a substantial and unjustifiable risk." (Emphasis added.) General Statutes § 53a-3 (13) and (14).[6]

The defendant readily admits that our statutes relating to vehicular homicide are applicable if death occurs through *criminal negligence* or simply through *negligence* in the operation of a motor vehicle. See General Statutes §§ 53a-57, 14-222a. He does not dispute that the crimes of first and second degree manslaughter include death resulting from *reckless* conduct. Nevertheless he continues to maintain that we should infer from the adoption of statutes expressly dealing with vehicular homicide, a legislative intent that persons causing death while operating a motor vehicle should be prosecuted only under those provisions. This argument is wholly without merit. It may be disposed of by little more than saying so.

The argument, we think, misapprehends the purpose and effect of the relevant statutes in chapter 952 of title 53a of the General Statutes. General Statutes § 53a-58 (a) provides that "[a] person is guilty of crimi-

---

[6] General Statutes § 53a-3 (13) provides: "A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ."

General Statutes § 53a-3 (14) provides: "A person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation . . . ."

nally negligent homicide when, with criminal negligence, he causes the death of another person, *except* where the [actor] caused such death by a motor vehicle." (Emphasis added.) This statute expressly excepts from its operation deaths caused by a motor vehicle. The legislature has thus manifested an intent to treat an actor who causes death through the criminally negligent operation of a motor vehicle differently than an actor who, with criminal negligence, causes death by means *other than* the operation of a motor vehicle. See General Statutes § 53a-57. In view of this difference in treatment, a violation of § 53a-57 is classified as a class D felony whereas a violation of § 53a-58 is only a class A misdemeanor.

The legislature, however, has made no such exception to the *manslaughter* provisions of chapter 952. The only provision in our homicide statutes which provides an exception for deaths caused by a motor vehicle is § 53a-58, the criminally negligent homicide statute. Principles of statutory construction lead us to conclude that the legislature did not intend such an exception to exist in our manslaughter provisions. We cannot create an exception to a statute in the very same chapter which the legislature itself has not created either expressly or by implication. See *State ex rel. Heimov* v. *Thomson,* 131 Conn. 8, 12, 37 A.2d 689 (1944); 2A J. Sutherland, Statutory Construction (4th Ed. Sands) § 47.11.

This conclusion is strengthened by reference to § 53a-57, the statute under which the defendant argues he should have been charged. That statute, by its express terms, only applies to an actor who, "with *criminal negligence in the operation of a motor vehicle,"* causes the death of another. (Emphasis added.) That statute is absolutely silent as to any criminal sanction where an actor, acting with a *more culpable state of mind,* causes the death of another in the operation

of a motor vehicle. Accordingly, because the legislature knows how to create an exception in a statute as it did in § 53a-58, and did not do so anywhere else in the relevant statutory scheme of chapter 952, the defendant, given the more culpable state of mind required under § 53a-55 (a) (3), was properly charged.

This approach does not denigrate the rubric that penal statutes are to be narrowly construed in favor of a defendant. See *State* v. *Tedesco,* 175 Conn. 279, 291, 397 A.2d 1352 (1978). Rather, statutory construction in the relevant statutory scheme justifies such a reasonable evaluation of legislative intent where criminal sanctions are made commensurate with the degree of culpability of the actor as the statutory scheme indicates.

The defendant raises no claim at this juncture that the statutes under which he was prosecuted are unconstitutional. His argument therefore raises no question of judicial construction but only one of legislative policy with which courts cannot interfere unless constitutional guarantees have been violated. We are not inclined to create an exception to our manslaughter statutes for every person operating a motor vehicle on a highway of the state who, in consequence of reckless operation, causes a loss of life. We are even less inclined to relax the rule so plainly laid down in other cases. See, e.g., *State* v. *Shine,* 193 Conn. 632, 479 A.2d 218 (1984); *State* v. *Campbell,* supra. It is a matter of common knowledge that many lives are.lost and many persons injured through the reckless operation of motor vehicles on the public highways. The safety of the public from injury and loss of life from the reckless operation of motor vehicles well may have been thought by the legislature to be of such supervening importance as to warrant the inclusion of a motor vehicle in the statutory definition of a "dangerous instrument." See Gen-

eral Statutes § 53a-3 (7). The prosecution of the defendant for the crimes of manslaughter and assault was therefore not erroneous.

B

The defendant also objects to being charged with manslaughter under General Statutes § 53a-55 (a) (3) on the ground that the statute as applied to him in this case is unconstitutionally vague. Specifically, he contends that the standard of recklessness, as defined by General Statutes § 53a-3 (13), is unconstitutionally vague because it did not give him fair warning as to when his conduct became reckless as opposed to criminally negligent.

The so-called "vagueness" doctrine is broadly based on constitutional requirements of due process. Under both the state and federal constitutions, "[a] defendant is constitutionally entitled 'to be informed of the nature and cause of the accusation' against him. Conn. Const., art. I § 8; U.S. Const., amend VI." *State* v. *Ruiz,* 171 Conn. 264, 269, 368 A.2d 222 (1976). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally* v. *General Construction Co.,* 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926); see also *State* v. *Chetcuti,* 173 Conn. 165, 167, 377 A.2d 263 (1977). We have previously stated that in order to withstand a vagueness challenge, a law "must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he may act accordingly." *Mitchell* v. *King,* 169 Conn. 140, 143, 363 A.2d 68 (1975); see also *State* v. *Chetcuti,* supra.

The defendant was accused in three separate counts of the crime of manslaughter in the first degree. The

substitute information charged that the defendant, under circumstances evincing an extreme indifference to human life, *recklessly* engaged in conduct which created a grave risk of death to another and thereby caused death. See General Statutes § 53a-55 (a) (3). Turning to the bill of particulars, we note that the defendant was fully and clearly informed that he had operated a motor vehicle recklessly. The operation of a motor vehicle upon a public highway is a clearly defined act, susceptible of being easily understood. Its operation recklessly is a description of a fact.

We do not agree with the defendant that it is impossible to draw a sound line of distinction between vehicular homicides caused by criminal negligence on the one hand, and recklessness on the other hand, and say that one is specific and certain and the other vague and indefinite. To operate a motor vehicle upon a public highway recklessly is not an intangible act. It has specific relation to possible contact with human beings.

Under General Statutes § 53a-3 (13), a person acts *recklessly* when he "is aware of and consciously disregards a substantial and unjustifiable risk." A person acts with *criminal negligence* "when he fails to perceive" such a risk. General Statutes § 53a-3 (14). The difference between these mental states is clear. Recklessness involves a *subjective realization* of a risk and a conscious decision to ignore that risk; see *State* v. *Ghiloni,* 35 Conn. Sup. 570, 573, 398 A.2d 1204 (1978); whereas criminal negligence concerns a failure to realize that risk. See General Statutes § 53a-3 (14). The record in this case shows beyond doubt that the defendant knew what he was charged with and that he was not misled in any way in the preparation of his defense. The statutes under which the defendant was charged are not unconstitutionally vague as applied to the defendant.

## II

We next turn to the defendant's claim that his motions for judgment of acquittal were erroneously denied. He argues that the state failed to prove the crimes of manslaughter in the second degree and assault in the third degree beyond a reasonable doubt because no evidence was introduced to show that his conduct amounted to recklessness; that is, that he was aware of and consciously disregarded a substantial and unjustifiable risk. See General Statutes § 53a-3 (13). It is the defendant's position that the unexpected entry of a vehicle from a private driveway onto the highway obstructed his view and caused the collision with the Mitchell vehicle.

This court is bound by well settled rules when a jury verdict is challenged on the ground that the evidence is insufficient to sustain the verdict. We will not weigh the evidence nor resolve questions concerning the credibility of witnesses. Instead, we look to that evidence most favorable to the state and to all reasonable inferences to be drawn therefrom. If, from that viewpoint, there is substantial evidence of probative value to sustain the jury's verdict as to each element of the crime, the verdict will not be disturbed. *State* v. *Giguere,* 184 Conn. 400, 403, 439 A.2d 1040 (1981); *State* v. *Jackson,* 176 Conn. 257, 262, 407 A.2d 948 (1978).

The testimony established that at the time of the collision the defendant was driving at an excessive rate of speed, having no regard to the traffic on the highway. Eyewitnesses testified that the defendant disregarded overhead traffic signals, failed to stop upon signal by a police officer, improperly passed other vehicles and failed to drive in the proper lane. In our view, the evidence and the reasonable inferences drawn therefrom permitted the jury to determine that the defendant had driven recklessly.

Recklessness is an essential element of the crimes of manslaughter and assault and must be proven by the state beyond a reasonable doubt. We have recognized the difficulty of proving by direct evidence that an accused subjectively realized and chose to ignore a substantial risk. We have held, therefore, that "[t]he state of mind amounting to recklessness may be inferred from conduct." *Mooney* v. *Wabrek,* 129 Conn. 302, 308, 27 A.2d 631 (1942); see also *State* v. *Ghiloni,* supra; W. LaFave & A. Scott, Criminal Law (2d Ed.) § 30.

From the testimony it is clear that the defendant knew or should have known that his driving conduct was in violation of the law and that death and injury was a probable consequence of his violations. The jury was free to disregard the evidence pertaining to the unexpected entry of another vehicle from a private driveway onto the highway. The defendant has merely pointed to a conflict in the evidence, the resolution of which is for the jury and not a proper consideration for this court. In sum, the evidence was sufficient to support the jury's finding that the defendant was guilty of manslaughter in the second degree and assault in the third degree.

### III

The defendant's third claim is that the court erred in certain rulings at trial. First, he contends that the court erred in refusing to allow him to cross-examine two state witnesses concerning a civil action filed against them on behalf of the victims of the collision. Next, he claims the court erred in excluding evidence of a speed survey conducted by the police at the scene of the collision. We find no error in either ruling by the trial court.

The facts pertinent to the cross-examination claim may be summarized. During the cross-examination of Rohner, the defendant asked whether the Mitchell

family and the Mitchell estate had filed a lawsuit against the officer. After objection by the state, the court ruled that the defendant could inquire whether the officer knew of the civil action, remarking that "[a]nything that would go to show bias, motivation and prejudice is admissible." The court also allowed the defendant to inquire whether Rohner was aware of the specific allegations in the complaint. The defendant was not allowed to inquire, however, as to the specific allegations themselves. Specifically, the defendant was prohibited from revealing to the jury that the civil complaint alleged reckless misconduct on the part of the officers who pursued the defendant. The court stated that questions concerning the specific allegations made in the complaint would only raise collateral matters and confuse the jury. The same issue arose during the cross-examination of Topliff and following objection, inquiry into the specific allegations of the complaint was prohibited.

In an apparent attempt to rehabilitate Rohner, the state, on redirect examination, elicited testimony from Rohner that he did not fear financial loss from the pending civil action because the officers who were sued were indemnified by an insurance company. The state then requested that the court take judicial notice of a letter in the court file of the pending civil case. The letter, which was from the East Hartford corporation counsel, indicated that the municipality would pay any damages assessed against the officers. The defendant objected, arguing that the letter was irrelevant, prejudicial and not a proper subject for judicial notice. The court overruled the objection and took judicial notice of the letter, part of which was later read to the jury.

The defendant contends that the court's refusal to allow questions concerning the specific allegations of the civil complaint denied him the opportunity to attack the officers' credibility by a showing of possible bias.

According to the defendant, without knowledge of the complaint the jury was deprived of facts necessary to judge the officers' reliability.

The sixth amendment to the federal constitution guarantees an accused in a criminal prosecution the right to confront witnesses against him. *Pointer* v. *Texas,* 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *State* v. *Lubesky,* 195 Conn. 475, 481, 488 A.2d 1239 (1985). "The primary interest secured by the confrontation clause of the sixth amendment is the right to cross-examination." *State* v. *Milum,* 197 Conn. 602, 608, 500 A.2d 555 (1985); see *Douglas* v. *Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965). One important function of cross-examination is to expose a witness's possible motivation in testifying. See *State* v. *Privitera,* 1 Conn. App. 709, 712, 476 A.2d 605 (1984). To comport with sixth amendment standards, the defendant must be allowed to "expose to the jury the facts from which the jurors, as sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska,* 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).

Several of our recent decisions have discussed the issue of whether, and to what extent, a prosecution witness may be cross-examined regarding a related civil action that the *witness* has filed against the *defendant.* See *State* v. *Milum,* supra; *State* v. *Ballas,* 180 Conn. 662, 433 A.2d 989 (1980); *State* v. *Privitera,* supra. In the present case, the civil suit was filed by a third party against the witnesses. We may look to those recent decisions for guidance, however, because the underlying concerns in those cases were essentially the same as those underlying the present case. In *State* v. *Milum,* supra, 610, we explained that: " 'As a general rule cross-examination of the prosecuting witness should be allowed to show the *pendency, existence* and

*status* of [a] civil action . . . arising out of the same set of circumstances as those which served as the basis for the criminal prosecution.' " (Emphasis added.) *State* v. *Delucia,* 40 Or. App. 711, 596 P.2d 585, 587 (1979); see also annot., 98 A.L.R.3d 1060. Because the trial court in *Milum* did not allow any inquiry into the pendency of the civil action, we found error. *State* v. *Milum,* supra; see also *State* v. *Privitera,* supra.

In the present case, the defendant was allowed to question the officers as to their awareness of the pending civil action and also as to their knowledge of the specific allegations in the action. We have held that this degree of inquiry is sufficient to bring to the jury's attention facts which may impugn a witness's credibility. *State* v. *Ballas,* supra, 676–77. The trial court here did not violate sixth amendment standards by refusing to allow questions regarding the specific allegations themselves.

We also hold that the trial court's rulings did not constitute an abuse of discretion. A trial court " 'may restrict a cross-examination to evidence which is competent, material, and relevant . . . .' " Id., 676. Here, the trial judge disallowed the questions, ruling that they raised collateral issues and could confuse the jury. He correctly pointed out that the recklessness or gross negligence of one party is not a defense to a claim of recklessness against another party. See, e.g., *Menzie* v. *Kalmonowitz,* 107 Conn. 197, 200, 139 A.2d 698 (1928). The trial court's ruling was well within its discretionary powers.

The court also did not commit error by taking judicial notice of the letter from the East Hartford corporation counsel and admitting it into evidence. A court has the power to take judicial notice of the file in another case pending in that court. *Guerriero* v. *Galasso,* 144 Conn. 600, 605, 136 A.2d 497 (1957). A

trial court also has the power to determine the relevancy of evidence, and in exercising that power, is given broad discretion. *State* v. *Parker,* 197 Conn. 595, 601, 500 A.2d 551 (1985). It was well within the court's discretion to decide that the letter was relevant for rehabilitation purposes. Even though Rohner did not know of the letter's existence, the evidence clearly revealed that he knew he was indemnified. The letter thus tended to corroborate Rohner's testimony that he did not fear personal financial loss from the pending civil suit.

The defendant's second evidentiary claim is that the court erroneously excluded a speed survey made by the police at the scene of the accident. This survey, which was conducted by a member of the East Hartford police department within two weeks of the accident, measured the speed of the eastbound traffic on Silver Lane at about the same time of the day and in the place that the accident occurred. The survey revealed that the highest speed recorded was 82 m.p.h., the lowest was 16 m.p.h., and that the average speed, excluding the highest and lowest, was slightly over 37 m.p.h.[7]

The defendant claimed the evidence was relevant to determine whether the defendant's driving conduct evinced an extreme indifference to human life and constituted a gross deviation from the standard of care that a reasonable person would observe. The court rejected this argument and ruled that the evidence was not relevant to any issue before the court.

We have already noted that the trial court has broad discretion in determining the relevance of evidence.

---

[7] Two surveys were actually conducted. The first was performed on August 20, 1982, between 11:45 a.m. and 12:15 p.m. The highest speed recorded was 82 m.p.h., while the lowest speed was 16 m.p.h. The second survey was conducted on August 26, 1982. The highest speed recorded then was 72 m.p.h. The average speed recorded on the two days excluding the fastest and slowest vehicles was 37.2 and 37.4 m.p.h. respectively.

*State* v. *Parker,* supra. Once again, we are hard pressed to find that the court's ruling in this instance constituted an abuse of that discretion. The trial court noted, sua sponte, that the survey was confined to vehicles travelling east while the defendant here had been travelling west. The court further noted that often, vehicles travelling in one direction, for example, away from a particular site during the lunch or rush hours, will travel at a rate of speed different from those travelling in the opposite direction. These observations by the court highlight the irrelevance of the survey. In addition, the violation of speeding laws at the site of the accident by others has little, if any, relevance to the question of whether the defendant's entire course of conduct at the time and place in question was reckless. In short, we fail to find a clear abuse of the court's discretion in this ruling.[8] *State* v. *Falcon,* 196 Conn. 557, 566, 494 A.2d 1190 (1985).

## IV

The defendant next contends that the entire office of the state's attorney should have been disqualified from the defendant's case because of an alleged conflict of interest. Prior to trial, the defendant moved that the office of the state's attorney for the Hartford-New Britain judicial district be disqualified on the ground that an assistant state's attorney in that office, Dennis O'Connor, had previously represented the defendant in criminal matters. During an evidentiary hearing, it was revealed that O'Connor had been a deputy assistant public defender in Hartford from October, 1976, to November, 1979, and that during that time he had represented the defendant. O'Connor could not recall

---

[8] The defendant also claims that the trial judge's ruling deprived him of his right to compulsory process under the state and federal constitutions. This claim is but another instance of a defendant placing "a constitutional tag on a nonconstitutional claim." *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985); *State* v. *Gooch,* 186 Conn. 17, 18, 438 A.2d 867 (1982).

the number of times he had represented the defendant. He was, however, able to identify the defendant in court. There was no evidence that their prior association was in any way related to the present case.

O'Connor did not immediately inform the other prosecutors in the state's attorney's office of his prior association with the defendant when he learned of the present prosecution. Several months prior to trial, however, he believes that he informed the state's attorney, John M. Bailey, and other prosecutors of this fact. On one occasion, O'Connor was present when an assistant state's attorney, Kevin McMahon, and an investigator were discussing some aspects of the defendant's case. O'Connor could not recall anything of the conversation except that he informed McMahon and the investigator that he thought he had represented the defendant while serving as a public defender. O'Connor also recalled that he and several prosecutors had been subpoenaed by the defendant to testify at the hearing on the defendant's motion to dismiss the information based on selective prosecution. He further testified that prior to that hearing he and some of the other prosecutors who had been subpoenaed discussed the issues raised in that motion and discussed the elements of the manslaughter and vehicular homicide statutes.

Following the hearing, the trial court disqualified O'Connor and McMahon from any further participation in the defendant's case. The court refused, however, to disqualify any of the other prosecutors affiliated with the office of the state's attorney for the Hartford-New Britain judicial district from further proceedings in the case.

In *State* v. *Jones,* 180 Conn. 443, 429 A.2d 936 (1980), overruled in part on other grounds, *State* v. *Powell,* 186 Conn. 547, 442 A.2d 939 (1982), cert. denied sub nom. *Moeller* v. *Connecticut,* 459 U.S. 838, 103 S. Ct. 85, 74

L. Ed. 2d 80 (1982), the matter of attorney disqualification was extensively discussed. There, we explained that the trial court has broad discretion in determining whether an attorney should be disqualified, due to an alleged breach in confidentiality or conflict of interest. Id., 448. Noting Canons 4 and 9 of the Code of Professional Responsibility,[9] we set forth essentially a two part test to be employed when a claim of disqualification arises. Disqualification of an attorney is warranted if the moving party establishes first, that "he had in the past enjoyed an attorney-client relationship with the attorney" and second, that the attorney had "accepted employment adverse to the interests of a former client on a matter substantially related to the prior litigation." Id., 449–50. Under the substantial relationship portion of the test, disqualification is the proper sanction only upon a showing that the relationship between the issues in the prior and present cases is "patently clear" or where the issues are "essentially the same." Id., 449.

Employing the two part test, we held in *Jones* that disqualification of a prosecutor who had formerly represented the defendant was a proper sanction, but that disqualification of the office of the state's attorney was not warranted. Id., 452, 457. The defendant recognizes our holding in *Jones* but argues that the case is distinguishable. In *Jones,* there was no evidence that the prosecutor had discussed the defendant's case with other prosecutors. In the present case, however, the evidence clearly disclosed that the discussions as hereinabove set forth took place.

The defendant maintains that O'Connor's prior representation enabled him to obtain "confidential informa-

---

[9] Canon 4 of the Code of Professional Responsibility provides: "A Lawyer Should Preserve the Confidences and Secrets of a Client."

Canon 9 provides: "A Lawyer Should Avoid Even the Appearance of Professional Impropriety."

tion" about the defendant's personal background, his family, and his medical and drug problems. He claims that this information was relevant to the defendant's mental state, which is one of the essential elements of the crimes charged. Because O'Connor discussed the elements of the crimes with other prosecutors, the defendant contends that there was opportunity for O'Connor to disclose the background information concerning the defendant to the other prosecutors. This opportunity, he claims, in and of itself, required disqualification of the entire office of the state's attorney. The trial court rejected this argument.

The record does indicate conduct on the part of O'Connor which deserves criticism. When O'Connor recalled his former representation, he had a duty to remove himself entirely from *any* further contact with anyone involved in prosecuting his former client. Due regard for avoidance of even the appearance of ethical impropriety required his immediate and total withdrawal. The fact that O'Connor deviated from this standard does not, however, in and of itself require disqualification of the other prosecutors in the office.

There was evidence to show that O'Connor overheard a conversation between another prosecutor and an investigator, and had discussed with several prosecutors the defendant's selective prosecution motion in connection with which they had been subpoenaed. There was no evidence, however, that O'Connor ever discussed the factual issues or merits of the defendant's case with the other prosecutors. Of more importance, there was no evidence that O'Connor confided in the other prosecutors any information or knowledge of the defendant's background that he had acquired during his prior association with the defendant.

As we explained in *State* v. *Jones,* supra, 452–53, "the appearance of impropriety alone is 'simply too slender

a reed on which to rest a disqualification order except in the rarest of cases.' *Board of Education of the City of New York* v. *Nyquist,* 590 F.2d 1241, 1247 (2d Cir. 1979)." In many of the cases where entire firms have been disqualified, those firms had obtained some advantage in the pending litigation because of their access to prior confidential communications between the lawyer and his former client. *State* v. *Jones,* supra, 454; see, e.g., *NCK Organization, Ltd.* v. *Bregman,* 542 F.2d 128, 135 (2d Cir. 1976); *Canadian Gulf Lines, Inc.* v. *Triton International Carriers, Ltd.,* 434 F. Sup. 691, 695 (D. Conn. 1976). The record does not reveal such an advantage in the present case. Other courts have ordered firm disqualification where one attorney had actually been involved on the opposing side in the pending litigation, or in matters substantially related to it. See *United States* v. *Uzzi,* 549 F. Sup. 979, 984 (S.D.N.Y. 1982); *Reardon* v. *Marlayne, Inc.,* 163 N.J. Super. 529, 541, 395 A.2d 255 (1978), aff'd, 83 N.J. 460, 416 A.2d 852 (1980). Clearly, that is not the situation in the present case. There was no evidence that O'Connor's prior association with the defendant was related in any way to the present litigation. Under the facts of this case, we cannot say that the court abused its discretion in denying the motion to disqualify all of the prosecutors. Our conclusion, however, does not forestall further inquiry in another proceeding, into what information the prosecutors obtained, directly or even indirectly from O'Connor.

## V

The defendant's next claim of error is that the court improperly charged the jury regarding the defendant's mental state. His challenge is divided into three parts. He contends that the court erred first, in its instructions on the element of recklessness, second, in instructing the jury that a person is responsible for the natural consequences of his acts, and third, in not allowing the

jury to consider whether the defendant had lost control of his vehicle prior to the fatal collision. We reject each of these claims.

It is well established that in reviewing instructions to the jury, we do not read the challenged portions in isolation but consider the charge as a whole. *State* v. *Fleming,* 198 Conn. 255, 268, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); *State* v. *Hines,* 187 Conn. 199, 206, 445 A.2d 314 (1982). A reversal is required only if it is reasonably possible that the jury was misled in reaching its verdict. *State* v. *Fleming,* supra, 269.

We turn first to the defendant's challenge to the portion of the charge regarding the definition of recklessness. At one point in its instructions, the court summarized the definition of recklessness but omitted the element of an awareness and conscious disregard of the risk. See General Statutes § 53a-3 (13). It is the defendant's position that this instruction diluted the state's burden of proving every element of the offense beyond a reasonable doubt. See *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). The defendant did not take exception to this portion of the charge. We will consider his claim, however, because the failure to instruct a jury properly on an element of the offense is reviewable under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). See *State* v. *Hill,* 201 Conn. 505, 512–13, 518 A.2d 388 (1986).

A short time before giving the challenged instruction, the court defined recklessness to the jury and included the element of an awareness of and conscious disregard of the risk. The court later instructed the jury on the issue of manslaughter in the second degree and again gave the complete definition of recklessness. Finally, in response to the jury's request for supplemental instructions on several aspects of the case, the court

read the complete statutory definition of recklessness to the jury. Considering this charge as a whole, we cannot conclude that the jury could reasonably have been misled as to the meaning of recklessness. Although the jury on one occasion heard an incomplete definition of recklessness in the context of a summary of the term, the complete definition was given on three other occasions. The court also informed the jury that the state must prove all elements of the crime beyond a reasonable doubt. We are convinced, therefore, that the jury was correctly informed as to the definition of recklessness.

The defendant next claims that a portion of the court's instructions violated the holding in *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979). The court here told the jury that "Every person is held to be responsible for the natural consequences of his acts." In *Sandstrom,* a similar instruction was held to have violated a defendant's due process rights because the jury might have interpreted the statement as a conclusive or burden-shifting presumption, thereby relieving the state of its burden of proving every element beyond a reasonable doubt. Id., 517–24.[10] Although the defendant here took no exception to the portion of the instruction át issue, his claim is reviewable under *State* v. *Evans,* supra. See *State* v. *Williams,* 199 Conn. 30, 33, 505 A.2d 699 (1986).

"In reviewing instructions to the jury the court looks at the charge as a whole, and will not sever one portion and analyze it in isolation from the rest." *State* v. *Harrison,* 178 Conn. 689, 693, 425 A.2d 111 (1979); see also *State* v. *Lenczyk,* 1 Conn. App. 270, 273, 470

[10] In *Sandstrom* v. *Montana,* 442 U.S. 521, 517, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), the challenged instruction provided that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts."

A.2d 1240 (1984). When the court's statement here is viewed in its proper context, it is clear that no violation of *Sandstrom* occurred.

The jury in this case had been informed that a civil suit was pending against the officers who had pursued the defendant. After making the challenged statement the court continued to instruct the jury that if an accused "commits a felonious act, it does not alter its nature or diminish its criminality to prove that other causes cooperated to produce that result." The court concluded this portion of its instructions as follows: "It is for these reasons that I charge you that whatever role the conduct of Officers Rohner and Topliff had in the final result is wholly irrelevant and immaterial to Daryl Bunkley's criminal liability, and cannot be used to insulate the defendant . . . from criminal responsibility."[11]

The challenged portion was thus given as part of the court's instructions as to the legal effect that the officers' conduct might have on the defendant's liability. The instructions, including the challenged sentence, properly stated the law with regard to this issue. See *State* v. *Spates,* 176 Conn. 227, 235, 405 A.2d 656 (1978), cert. denied, 440 U.S. 922, 99 S. Ct. 1248, 59 L. Ed. 2d 475 (1979); *State* v. *Alterio,* 154 Conn. 23, 30, 220 A.2d 451 (1966). Since the challenged statement was not given as part of the court's instruction on an

---

[11] The entire instruction was as follows: "Every person is held to be responsible for the natural consequences of his acts. And if he commits a felonious act, it does not alter its nature or diminish its criminality to prove that other causes cooperated to produce that result. The State has no burden of proving that the defendant's acts were the sole or only acts which caused the final result of the accident and physical injuries to which I will refer in a few minutes. It is for these reasons that I charge you that whatever role the conduct of Officers Rohner and Topliff had in the final result is wholly irrelevant and immaterial to Daryl Bunkley's criminal liability, and cannot be used to insulate the defendant, Daryl Bunkley, from criminal responsibility."

element of the crimes charged, it did not shift the state's burden of proving the elements beyond a reasonable doubt. Compare *Sandstrom* v. *Montana,* supra; *State* v. *Johnson,* 185 Conn. 163, 171, 440 A.2d 858 (1981), aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983). The charge therefore did not violate the dictates of *Sandstrom* v. *Montana,* supra.

The defendant's final challenge to the instructions concerns the court's refusal to instruct that loss of control of the defendant's vehicle was relevant to determining the defendant's state of mind. The defendant filed a request to charge which asked essentially that the jury be told that the defendant's necessary mental state had to be formed prior to the time when the defendant lost control of his vehicle. The court declined to give the requested instruction, informing the jury instead that whether the defendant had control of his vehicle prior to the fatal collision was immaterial and irrelevant to his criminal liability. The defendant duly excepted to the instruction as given.

The purpose of a court's instructions is to give the jury "a clear understanding of the elements of the crime charged and the proper guidance to determine if those elements were present." *State* v. *Avila,* 166 Conn. 569, 574, 353 A.2d 776 (1974). Instructions to the jury need not be in the precise language of a request. Id.

The court here charged the jury on the specific elements of the crime of manslaughter in the first degree, including the element of recklessness. It then instructed the jury on proximate cause, stating that if the defendant set in motion a chain of events that led to the victims' death without interruption from other causes, then he may be found to have caused those deaths. The court concluded by stating that whether the defend-

ant had control of his vehicle immediately prior to the collision was therefore immaterial.[12]

From this brief summary of the court's instructions on manslaughter, it is clear that the jury was clearly and fully instructed on the elements of the crime including the element of recklessness and on the necessary causal connection between any reckless conduct and the resulting deaths. The court's refusal to deliver the charge requested by the defendant was a proper exercise of its discretion. *State* v. *Avila,* supra.

## VI

Finally, the defendant claims that his conviction and consecutive punishment for the manslaughter and assault counts arising from one accident violated his constitutional protection against double jeopardy. See U.S. Const., amend. VIII. We recently rejected double jeopardy challenges to consecutive sentences imposed for the felony murder of two victims of the same robbery; see *State* v. *Couture,* 194 Conn. 530, 656, 482 A.2d 300 (1984); and for the deaths of fourteen victims of the same act of arson. See *State* v. *Madera,* 198 Conn. 92, 110, 503 A.2d 136 (1985). Our reasoning in both cases was that the statutes under which the defendants were

---

[12] The court's instructions on proximate cause were as follows:

"A death or injury is a direct proximate cause where it directly and materially contributed to the happening of a subsequent accruing immediate cause of death or injury. As the rule is otherwise stated, if the acts of the defendant were the cause of the death or injury, no more is required. It is unnecessary for proximate cause purposes that the particular kind of harm that results from the defendant's conduct be intended by him.

"In many situations giving rise to criminal liability, the harm that results is unintended, yet is directly or indirectly caused by an act of the defendant. If you find that this defendant set in a motion a chain of events that led to the death of each of the three victims, without interruption from other causes, then that is sufficient evidence from which you can find that the defendant caused the death of the three victims. I therefore charge you that whether Daryl Bunkley had control of the brown Lincoln he was operating just prior to the fatal impact is immaterial and irrelevant to his criminal liability, and is not a fact for your determination."

convicted both used the language "causes the death of a person." We explained that: "A fundamental purpose of the criminal law is to protect individual citizens from the criminal conduct of another. People are neither fungible nor amorphous. Where crimes against persons are involved, a separate interest of society has been invaded for each violation. Therefore when two or more persons are the victims of a single episode there are as many offenses as there are victims." *State* v. *Couture,* supra, 565–66; see also *State* v. *Madera,* supra.

The manslaughter statute under which the defendant was convicted here authorizes a finding of guilt for one who "causes the death of *another person.*" (Emphasis added.) General Statutes § 53a-56 (a) (1). The assault statute likewise uses the language "causes serious physical injury to *another person.*" (Emphasis added.) General Statutes § 53a-61 (a) (2). These phrases are quite similar to the language contained in the statutes at issue in *Couture* and *Madera.* We therefore adopt the reasoning employed in those decisions and reject the defendant's claimed violation of the double jeopardy clause.

There is no error.

In this opinion the other justices concurred.