## STATE OF CONNECTICUT *v.* WILLIAM A. JUPIN, JR. (9229)

NORCOTT, HEIMAN and CRETELLA, Js.

Argued September 24, 1991—decision released January 7, 1992

*John T. Walkley,* for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Steven Sedensky,* assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant appeals from the judgment of conviction, after a jury trial, of assault in the

first degree in violation of General Statutes
§ 53a-59 (a) (3).[1] He claims that the trial court improp-
erly (1) denied his motion for judgment of acquittal
because the evidence was insufficient to prove beyond
a reasonable doubt that he acted under circumstances
evincing extreme indifference to human life, (2) refused
to charge the jury on the lesser included offense of
assault in the third degree in violation of General Stat-
utes § 53a-61 (a) (2), and (3) refused to exclude the vic-
tim from the courtroom, thereby denying the defendant
his constitutional right to a fair trial. We affirm the
judgment.

The jury could reasonably have found the following
facts. In September, 1988, the defendant and the vic-
tim, Diana Wright, lived in a second floor apartment
on Fox Street in Bridgeport. Sharing the apartment
were Ronald Donaldson, his girl friend, Cindy Terwil-
liger, who had known Wright for nine years, and Ter-
williger's three year old daughter. A common wall
separated the bedroom that Wright and the defendant
occupied from that of Donaldson and Terwilliger.
Wright and the defendant usually slept until noon or
1 p.m. on Saturdays. By September, 1988, Wright had
developed a serious drinking problem for which Ter-
williger had encouraged her to seek counseling.

On the evening of September 23, 1988, the defend-
ant and Wright, along with a friend, went to a bar. At
about 10:30 or 11 p.m., the defendant brought Wright
home, believing she was drunk. He then returned to
the bar. At about 1 a.m. on September 24, 1988, Ter-
williger saw Wright washing dishes in the apartment.
At about 1:30 a.m., while Terwilliger was asleep in her

[1] General Statutes § 53a-59 (a) provides in part: "A person is guilty of
assault in the first degree when . . . (3) under circumstances evincing an
extreme indifference to human life he recklessly engages in conduct which
creates a risk of death to another person, and thereby causes serious phys-
ical injury to another person."

bedroom, an ambulance and a paramedic, Peter Yuro, arrived. Although Yuro spent less than twenty minutes examining Wright, he learned that she was sick and felt pain throughout her body. She told him she had "the blues" and had been drinking earlier that night, but could not remember how much. She also indicated she had emotional problems for which she was taking medication. Yuro noted that Wright became confused during the examination and exhibited some unusual behavior in that she talked to and treated a doll as if it were a child. Yuro found her respiration, blood pressure and pulse to be normal, and did not note any indicia of trauma on her body. He did not recall smelling alcohol on her. Wright spoke to him in a normal manner and gave him both her Social Security and telephone numbers. After the examination, she walked out of the apartment without assistance with Yuro to go by ambulance to Park City Hospital.

Between 2 and 2:30 a.m., the defendant returned to the apartment and knocked on Terwilliger's door, looking for Wright. He told Terwilliger that he and a friend had been at a bar with Wright and he had taken Wright home because she was drunk. The defendant then found a note stating that Wright had gone to the hospital. Shortly thereafter, Wright telephoned the defendant and asked for a ride home. The defendant then went to the hospital to get her. Although Wright had completed various paperwork upon arriving at the hospital, she left with the defendant before seeing a physician. She told the defendant at the hospital that she was all right, and the couple arrived home between 3 and 3:30 a.m. The defendant then locked their liquor on their porch to prevent Wright from drinking any more. Shortly thereafter, an argument ensued between them. Through the wall between the bedrooms, Terwilliger heard the couple arguing about why Wright had gone to the hospital. After knocking on their door

and asking them to be quiet, she did not see or hear anything further in the apartment. She left with her daughter and Donaldson later that morning. During the argument, Wright had become abusive and fought with the defendant, scratching his arms and chest. He slapped her on her cheek with an open hand at about 4 a.m., and then they went to bed. Later that morning as Terwilliger was leaving the apartment, she looked through a crack in the door and saw the couple asleep in bed.

At about 11 a.m., the defendant awoke and, while Wright was still in bed, went to a nearby store to buy a TV Guide and a bottle of soda. Upon returning, he looked through the TV Guide and then began doing some household repairs. Twice during the afternoon, he noticed that Wright had urinated in bed. He removed her nightgown and twice applied baby powder to dry her. Later, he heard her breathing heavily and tried to awaken her, but she did not respond. At about 3:30 p.m., he called Park City Hospital and told a nurse he had a female friend whom he had been unable to awaken for the past few hours. The nurse suggested that he call an ambulance. The defendant did so, and at about 4:30 p.m. two paramedics, Kurt Liell and Parker Christopher, arrived.

Liell and Christopher found Wright unconscious in bed and unsuccessfully tried to awaken her. With the defendant present, Liell examined Wright. She did not respond to stimuli. Liell found bruises on her face, around her head and behind one of her ears. The bruise behind the ear could have signified a head injury or a basal skull fracture, a thin crack in the bone next to the ear. Liell saw multiple bruises on her upper body, including her entire chest, and on her stomach and legs. When he examined her pupils, he found the left one to be dilated and unresponsive to light. Upon opening her eyes, Liell noticed they did not move. Her teeth

also were clenched, signifying possible head trauma. Liell saw blood on her teeth and lips that appeared to have been wiped away, and detected breathing problems and an abnormally high heart rate. He saw that Wright's body was covered with baby powder, which the defendant told Liell he had used to dry her after she had urinated. The defendant also told the paramedics he had argued with Wright and had slapped her a couple of times.

Wright was then taken to the hospital, where she arrived comatose, essentially the same condition as that in which Liell and Christopher had found her. Tests done in the emergency room showed her blood alcohol level just prior to surgery measured 0.03, indicating she was not under the influence of intoxicating liquor.[2] A registered nurse in the emergency room, Irene LaConte, saw the bruise behind one of Wright's ears. She attributed it to brain trauma and said such a bruise would not be caused by a slap unless the blow had been very forceful.

A neurosurgeon, Michael Opalak, then examined Wright and performed surgery on her shortly thereafter. He found bruises behind both her ears and determined that she was suffering from an acute subdural hematoma, which is caused by a torn vein or artery in the brain and involves a blood clot in the tissues of the skull that line and cover the brain. He determined that Wright's condition had developed in the preceding seventy-two hours, and that there had been bleeding in her brain for between forty-eight and seventy-two hours prior to surgery. It was unlikely that a person experiencing a subdural hematoma would have been in the same condition Wright was in at 1:30 a.m. Con-

[2] In the context of operating a motor vehicle, a person is presumed to be under the influence of alcohol when his blood alcohol level measures .10 or higher. See General Statutes § 14-227a; *State* v. *LeRoy,* 16 Conn. App. 472, 478–79, 547 A.2d 940 (1988).

tact with a floor, wall or furnishings could have caused her condition, but it was very unlikely that she caused the acute subdural hematoma by falling down. Opalak did not see anything during surgery indicating that a fall had caused Wright's condition; a fall would not likely have resulted in the rupture of the particular veins that were damaged. Opalak stated that more than a slap was needed to cause Wright's condition, and that a blunt rather than a sharp object was the cause.

Wayne Carver, the chief state medical examiner, reviewed Wright's medical records and found nothing to indicate that a subdural hematoma existed at 1:30 a.m. when Yuro first examined her. Carver determined that Wright's condition could have been caused by a blunt injury to the head, including a fall to the floor in her apartment. He determined that a subdural hematoma could be caused by the amount of force required to fracture the skull, and that a single blow to the head could have caused both the skull fracture and the subdural hematoma. Bruises to the back of the ear commonly signify basal skull fractures, and the accumulation of blood that caused damage in Wright's brain began within the forty-eight hours prior to her surgery. Carver found that the damage to her brain had progressed rapidly, and he characterized the force that caused her condition as a "good brisk deed" that went from side to side in striking her.

After surgery, Wright remained in a coma from which she did not begin to emerge for twelve to eighteen months. She developed hydrocephalus, an excess of fluid that becomes trapped in chambers of the brain, which then enlarge and compress the brain. A shunt was implanted to drain the fluid to relieve the hydrocephalus. She is presently able to open her eyes, look around and answer a few questions, but she is unable to live outside a hospital or nursing home environment.

## I

The defendant first challenges the sufficiency of the evidence regarding the charge of assault in the first degree. He claims that the cumulative effect of the direct and circumstantial evidence was insufficient to prove each element of the crime beyond a reasonable doubt. He specifically argues that the state failed to prove that he recklessly caused Wright's injuries. Thus, he asserts that two essential elements of § 53a-59 (a) (3) were not established. Further, the defendant proffers that the evidence supports other reasonable hypotheses that are inconsistent with his guilt of the crime charged. We do not agree.

The two part test for appellate analysis of a claim of evidentiary insufficiency is well established. First, we review the evidence presented at trial, construing it in the light most favorable to sustaining the jury's verdict. Second, we determine whether, on the facts so construed and the inferences reasonably drawn therefrom, the jury could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. *State* v. *Famiglietti,* 219 Conn. 605, 609, 595 A.2d 306 (1991); *State* v. *Montanez,* 219 Conn. 16, 19, 592 A.2d 149 (1991); *State* v. *Rice,* 25 Conn. App. 646, 650, 595 A.2d 947 (1991). In reaching its conclusions, a jury may draw reasonable and logical inferences from the facts proven, but it may not resort to speculation and conjecture. *State* v. *King,* 216 Conn. 585, 602, 583 A.2d 896 (1990). With respect to the type of evidence the jury employs to reach its verdict, it is immaterial to the probative force of that evidence that it be, in whole or part, circumstantial rather than direct. *State* v. *Allen,* 216 Conn. 367, 381, 579 A.2d 1066 (1990). Each essential element of the crime must be proved beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State*

v. *King*, supra, 601. Finally, in determining whether the jury reasonably could have found guilt, we ask if any rational factfinder could have done so. *State* v. *Montanez*, supra, 20; *State* v. *King*, supra.

The defendant first attacks the sufficiency of the evidence with respect to the element of causation. He claims that such an inadequate nexus exists between his conduct and Wright's injuries, that the jury could not find, beyond a reasonable doubt, that he caused those injuries. We do not agree.

The evidence shows that, although Wright became confused and exhibited some unusual behavior when paramedic Yuro examined her at 1:30 a.m., she otherwise responded to him in a normal manner and walked out of the apartment without assistance to go to the hospital in the ambulance. Yuro did not note any bruises or other indicia of trauma on her body during a nearly twenty minute examination, and the defendant testified that Wright said that she was all right when he picked her up at the hospital between 2:30 and 3 a.m. The defendant further testified that Wright was walking about the apartment and having a conversation with him between 3:30 and 4 a.m., just before the couple fought and he struck her. Terwilliger also saw Wright washing dishes at 1 a.m. and heard her arguing with the defendant at about 3:30 a.m.

The medical testimony also indicated that Wright's comatose condition did not exist just prior to the argument with the defendant. Both Opalak and Carver placed the onset of Wright's condition within forty-eight to seventy-two hours prior to her surgery in the afternoon of September 24, 1988. Both physicians testified, however, that it was unlikely that Wright had an acute subdural hematoma at the time Yuro examined her at 1:30 a.m. Opalak stated that more than a slap would have been necessary to cause Wright's con-

dition and that it was very unlikely that she had caused it by falling down. He found nothing during surgery to tie her condition to a fall, adding that it was unlikely that a fall would bring about the rupture of the particular veins in Wright's brain that were damaged. Opalak and Carver both stated that a blunt instrument likely caused Wright's condition, with Carver testifying that the amount of force necessary to fracture her skull would have been sufficient to cause a subdural hematoma. He stated that a single blow to the head could cause both the fracture and the subdural hematoma, adding that the force that caused Wright's condition went from side to side in striking her. From this evidence, the jury reasonably and logically could have concluded that Wright's injuries resulted from her having been struck with a blunt instrument sometime between 2:30 a.m. and 4:30 p.m. on September 24, 1988, and that the defendant was the only person who could have inflicted those injuries.

Although the defendant maintains that the cumulative effect of the direct and circumstantial evidence at trial was insufficient to prove that he caused Wright's injuries, we remain mindful of the well established principle that it is not the province of a reviewing court to "sit as a [seventh] juror . . . [even if] some doubt of guilt is shown by the cold printed record." (Internal quotation marks omitted.) *State* v. *King,* supra, 602. This court has not had the opportunity to observe the conduct, demeanor and attitude of the witnesses, nor has it had the chance to evaluate their credibility, tasks that are exclusively within the province of the jury as trier of fact. *State* v. *Carter,* 196 Conn. 36, 46, 490 A.2d 1000 (1985). We emphasize that it is not any single fact but the cumulative impact of a multitude of facts that establishes guilt when proof is based substantially on circumstantial evidence. *State* v. *King,* supra. After a scrupulous review of the record, we conclude that the

jury reasonably and logically could have determined that the cumulative effect of the evidence was sufficient to establish beyond a reasonable doubt that the defendant, using a blunt object, caused Diana Wright's injuries.

The defendant's next line of attack on the sufficiency of the evidence posits that the state failed to prove he acted recklessly. Although he concedes the testimony at trial showed he had fought with and slapped Wright, he contends that no other evidence was offered that cumulatively could have established reckless conduct on his part.

Assault in the first degree under § 53a-59 (a) (3) requires that a defendant recklessly engage in conduct that creates a risk of death to another person and thereby causes serious physical injury to another person. *Griffin* v. *Parker,* 219 Conn. 363, 365–66, 593 A.2d 124 (1991). A person acts recklessly with respect to a particular result or a circumstance described by a statute "when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. . . ." General Statutes § 53a-3 (13); *State* v. *Bunkley,* 202 Conn. 629, 643, 522 A.2d 795 (1987); see also *State* v. *Montanez,* supra, 22. Recklessness involves a subjective realization of that risk and a conscious decision to ignore it. *State* v. *Bunkley,* supra. It does not involve intentional conduct " ' "because one who acts recklessly does not have a conscious objective to cause a particular result." ' " *Griffin* v. *Parker,* supra, 370; *State* v. *Beccia,* 199 Conn. 1, 4, 505 A.2d 683 (1986). Because it is difficult to prove this through direct evidence, the " 'state of mind amounting to recklessness may be inferred from conduct.' " *State* v. *Bunkley,* supra, 645, quoting *Mooney* v. *Wabrek,* 129 Conn. 302, 308, 27 A.2d 631 (1942).

The evidence taken in the light most favorable to sustaining the verdict shows that the defendant admitted striking Wright at about 4 a.m. on September 24, 1988. It indicates that her condition at 1:30 a.m. was not consistent with that of a person suffering from an acute subdural hematoma. No bruises were visible on her body, and, even though she had been drinking the previous evening, she responded to a paramedic's questions in a normal manner and was able to walk out of the apartment under her own power. The defendant testified that Wright had said that she was all right when he picked her up at the hospital between 2:30 and 3 a.m. His testimony further showed that at about 3:30 a.m. she was still coherent enough to engage in conversation and inflict injuries on him in a physical confrontation. At 4:30 p.m., however, Wright was unconscious and had extensive bruising on her face, head and behind one ear. There were multiple bruises on her upper body, including her entire chest, and on her stomach and legs. Blood was found on her teeth and lips. Finally, the evidence indicates that no one other than the defendant was with Wright between 2:30 a.m. and 4:30 p.m. On the basis of the cumulative effect of this evidence, we conclude that the jury reasonably and logically could have inferred beyond a reasonable doubt that, when the defendant struck Wright, he consciously disregarded a substantial risk that serious physical injury would result.

Finally, with respect to his sufficiency of the evidence claims, the defendant posits that the verdict cannot stand because the evidence supports several reasonable hypotheses that are inconsistent with his guilt of the crime charged. We disagree.

The defendant urges on us the proposition that "any conclusion, reasonably to be drawn from the evidence, which is consistent with the innocence of the accused must prevail." *State* v. *Carpenter,* 214 Conn. 77, 84,

570 A.2d 203 (1990). He argues that such reasonable conclusions exist because no evidence shows that a fight occurred between the defendant and Wright that was either loud or prolonged, or that involved brutality or extreme indifference to human life. He asserts that the medical testimony shows it was not possible to conclude when Wright lost consciousness and that it was reasonable to infer that neither she nor the defendant would have been aware of the gravity of the situation for some time after the injury occurred. Further, the defendant contends that because Wright, on the evening of September 23, 1988, had been drinking alcoholic beverages "sufficiently to have a projected level of intoxication between" 0.22 and 0.29, this, along with her habit of sleeping late on Saturdays, and her complaints to paramedic Yuro and unusual behavior with a doll, give rise to several reasonable hypotheses inconsistent with guilt.

Our review of the record, however, leads us to reject the defendant's arguments. " 'A conclusion of guilt requires proof beyond a reasonable doubt, and proof to that extent is proof which precludes every reasonable hypothesis except that which it tends to support, and is consistent with the defendant's guilt and inconsistent with any other rational conclusion.' " *State* v. *Morrill,* 193 Conn. 602, 610, 478 A.2d 994 (1984). " 'But the requirement of proof beyond a reasonable doubt does not mean that the proof must be beyond a possible doubt, and a possible hypothesis or supposition of innocence is far different from a reasonable supposition.' " Id., 611; *State* v. *Payne,* 186 Conn. 179, 184, 440 A.2d 280 (1982); *State* v. *Foord,* 142 Conn. 285, 294–95, 113 A.2d 591 (1955). " ' "Emphasis needs to be placed on the distinction between the word 'reasonable' and the word 'possible.' . . . Proof of guilt must exclude every reasonable supposition of innocence . . . . '[A] mere "possible hypothesis" of innocence

will not suffice.' (Citations omitted.) *State* v. *Englehart,* 158 Conn. 117, 121–22, 256 A.2d 231 (1969)." *State* v. *Morrill,* supra, 611.' " *State* v. *Turner,* 24 Conn. App. 264, 270–71, 587 A.2d 1050, cert. denied, 218 Conn. 910, 591 A.2d 812 (1991).

We find that the defendant's arguments reflect merely possible hypotheses that fail to rise to the level of reasonable hypotheses inconsistent with guilt. Even if the dispute with Wright was not loud, prolonged or brutal, we cannot say it would have been unreasonable for the jury to conclude the argument could have resulted in violence that led to an acute subdural hematoma. A jury is free to draw inferences that are consistent with guilt as well as inferences that are consistent with innocence. *State* v. *Morrill,* supra, 610; *State* v. *Aleksiewicz,* 20 Conn. App. 643, 647, 569 A.2d 567 (1990). To argue to the contrary, as the defendant does, would require us to believe that the jury could find he had slapped Wright but that it could not find that his action led to an acute subdural hematoma. Because the defendant's suggestion that the argument was not loud or lengthy raises, at best, only a possible hypothesis of innocence, the jury was entitled to reject it in finding that the evidence established the defendant's guilt beyond a reasonable doubt. Similarly, even if it is not medically possible to determine when Wright lost consciousness, and even if it was reasonable for the jury to infer that neither she nor the defendant would have been aware of the seriousness of her injuries for some time after they had occurred, such assertions raise nothing more than possible hypotheses of innocence the jury was not required to credit. For the jury to have rejected the defendant's theories cannot be regarded as unreasonable or illogical in light of the ample amount of trial testimony detailing the symptoms of a subdural hematoma, the extensive amount of bruising on

Wright's body and the defendant's activities in the four to five hours before he summoned help.

The defendant's contention that Wright's use of alcohol and her complaints to paramedic Yuro at 1:30 a.m. give rise to reasonable hypotheses inconsistent with guilt also must fail. In essence, the defendant argues that Wright's condition already may have existed, since she was not feeling well and had exhibited unusual behavior prior to their argument. Opalak testified that Wright's behavior with the doll and her complaints to Yuro were not consistent with the symptomatology of an acute subdural hematoma, and both he and Carver testified that it was unlikely Wright was suffering from an acute subdural hematoma at 1:30 a.m. In light of this expert testimony, which the jury apparently chose to believe, we cannot say the defendant has raised anything more than a possible hypothesis of innocence.

We next consider the claim that alcohol may have played a role in Wright's injury. Because her blood alcohol level measured 0.03 just prior to her surgery on the afternoon of September 24, 1988, the defendant extrapolates backward and arrives at the conclusion that Wright must have had a blood alcohol level of between 0.22 and 0.29 at approximately 3:30 a.m. that morning, which could have resulted in a fall that caused her condition. Yet here again, the medical testimony, as well as the defendant's own testimony, undercuts his contentions.

The defendant testified that he took Wright home from the bar at about 10:30 or 11 p.m. on September 23, 1988. Although he had to help her to the car, he testified that when they arrived home she was cognizant enough to be aware that he was going to leave the apartment and asked him to stay. Later, between 2:30 and 3 a.m., Wright also was apparently coherent enough to make a telephone call to the defendant from

Park City Hospital to ask him for a ride home. Although he testified she had difficulty walking when he picked her up, he stated that after arriving home between 3 and 3:30 a.m., Wright walked freely about the apartment, engaged in conversation with him and fought with him, scratching his arms and chest.

The defendant's theory is further undercut by the testimony of Yuro, who did not recall smelling alcohol on Wright when he examined her at 1:30 a.m. and stated that she responded to his questions in a normal manner. Wright gave him various information, including her Social Security and telephone numbers, and walked out of the apartment without assistance to go to the hospital in the ambulance. In short, we decline to accept the defendant's reasoning, since it raises no more than merely possible hypotheses of innocence.

Viewing the cumulative effect of the evidence as a whole, and giving due weight to all the considerations urged on us by the defendant, we are persuaded that the state has established beyond a reasonable doubt that he acted with extreme indifference in causing serious physical injury to Wright. The record in this case, not unlike that in *State* v. *Famiglietti,* supra, contains direct evidence of the defendant's presence in the apartment shortly before he fought with Wright and of his continued presence there after he struck her. It was entirely reasonable and logical for the jury to have determined beyond a reasonable doubt that no one other than the defendant had the opportunity to inflict the injuries to her head and body that have left her so seriously debilitated today. See id., 614; *State* v. *Jordan,* 136 Conn. 201, 204, 69 A.2d 834 (1949). Accordingly, we reject the defendant's contention that the evidence was legally insufficient to justify a verdict of guilty of the crime of assault in the first degree.

## II

The defendant next claims that the trial court improperly refused to instruct the jury, as requested, on assault in the third degree; General Statutes § 53a-61 (a) (2); as a lesser included offense of assault in the first degree. The trial court denied the request because it did not conform to the requirements of Practice Book § 854, and the defendant excepted.

A defendant is entitled to a charge on a lesser included offense when he meets the four conditions set forth in *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980): "(1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." See *State* v. *Edwards,* 214 Conn. 57, 62–63, 570 A.2d 193 (1990); *State* v. *Dedrick,* 24 Conn. App. 518, 523, 589 A.2d 1241 (1991). The state claims that the defendant has not satisfied the first condition of the *Whistnant* test. We agree.

In *State* v. *McIntosh,* 199 Conn. 155, 158–61, 506 A.2d 104 (1986), our Supreme Court articulated the standards necessary to meet the first condition of *Whistnant,* which requires the defendant to request "an appropriate instruction." A proposed instruction is not appropriate unless it is made in compliance with Practice Book § 854. *State* v. *Hall,* 213 Conn. 579, 591, 569

A.2d 534 (1990). In the context of a written request to charge on a lesser included offense, this requirement of § 854 is met only if the proposed request contains " 'such a complete statement of the essential facts as would have justified the court in charging in the form requested.' *Michaud* v. *Gagne,* 155 Conn. 406, 410, 232 A.2d 326 (1967), quoting *Dwyer* v. *Connecticut Co.,* 103 Conn. 678, 680, 131 A. 838 (1925) . . . ." *State* v. *Killenger,* 193 Conn. 48, 57, 475 A.2d 276 (1984). A trial court has no obligation "to instruct, sua sponte, on general principles of law relevant to all issues raised in evidence." (Internal quotation marks omitted.) *State* v. *Hall,* supra, 592, quoting *State* v. *McIntosh,* supra, 160; *State* v. *Preyer,* 198 Conn. 190, 198 n.9, 502 A.2d 858 (1985).

Here, the defendant's request to charge did not comply with Practice Book § 854. It contained no facts whatsoever, much less " 'a complete statement of the essential facts as would have justified the court in charging in the form requested.' " *State* v. *Killenger,* supra, 57; *State* v. *Dedrick,* supra, 524. Indeed, the defendant's request to charge mirrored the "skeletal list of statutory subsections" in the request that was deemed inadequate in *State* v. *McIntosh,* supra, 159–61.

Although the defendant contends in his brief that "the factual and legal authority for the requested instruction here was more than clear to the Court from the evidence [adduced] at trial," our Supreme Court has expressly determined otherwise. See, e.g., *State* v. *Hall,* supra (defendant's testimony at trial insufficient to justify jury instruction on lesser included offense where written request to charge was inadequate). Moreover, the court has quite clearly expressed its preference for counsel's cooperation with respect to requests for jury instructions pursuant to Practice Book § 854. Such cooperation is no more than a minor burden that is neither unreasonable nor novel in light

of the ever increasing refinement of our law. *State* v. *McIntosh,* supra, 160–61. Because the defendant's proffered request failed to meet the first condition of *Whistnant,* we need not consider the other elements of the test. We conclude that, since the request contained no more than a recitation of the crime and its statutory provision, the trial court properly refused to instruct the jury on the elements of assault in the third degree, General Statutes § 53a-61 (a) (2), as a lesser included offense of the crime charged.

## III

The defendant's final claim is that he was denied his constitutional right to a fair trial because the court improperly refused to exclude Wright from the courtroom. During trial, Wright was wheeled into the courtroom in a geri-chair accompanied by her mother and two nurses. Wright was wearing a bathrobe and slippers. The defendant's counsel objected to her presence, claiming that it unfairly prejudiced the defendant's right to a fair trial. The court denied counsel's request that Wright be excluded from the courtroom, and the defendant excepted. On appeal, the defendant now claims that the mere presence of Wright in the courtroom constituted evidence that could have led the jury to be prejudiced against him, thereby infringing on his right to a fair trial.

" 'The function of the court in a criminal trial is to conduct a fair and impartial proceeding. *Glasser* v. *United States,* [315 U.S. 60, 82, 62 S. Ct. 457, 86 L. Ed. 680 (1942)].' *State* v. *Bember,* 183 Conn. 394, 401, 439 A.2d 387 (1981)." *State* v. *Fernandez,* 198 Conn. 1, 10, 501 A.2d 1195 (1985). "A fair trial is implicit in the term 'due process of law.' " *State* v. *Asherman,* 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), quoting *Wojculewicz* v. *Cummings,* 145 Conn. 11, 19,

138 A.2d 512, cert. denied, 356 U.S. 969, 78 S. Ct. 1010, 2 L. Ed. 2d 1075 (1958). " ' "Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U.S. Const., amend. XIV; Conn. Const., art. I, § 8; *Lisenba* v. *California*, 314 U.S. 219, 62 S. Ct. 280, 86 L. Ed. 166 [1941]; *Wojculewicz* v. *Cummings* [supra]" ' " *State* v. *Fernandez*, supra.

A trial judge in a criminal case may take all steps reasonably necessary for the orderly progress of the trial. *State* v. *Woolcock*, 201 Conn. 605, 622, 518 A.2d 1377 (1986); *State* v. *Siller*, 12 Conn. App. 395, 398, 530 A.2d 1106, cert. denied, 205 Conn. 811, 532 A.2d 586 (1987). Control of the proceedings in the courtroom is necessarily within the trial judge's discretion. *Antel* v. *Poli*, 100 Conn. 64, 69, 123 A. 272 (1923). He is responsible for having the trial conducted in a manner that approaches an " ' " 'atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding.' *Glasser* v. *United States*, [supra]; *Quercia* v. *United States*, 289 U.S. 466, 469, 53 S. Ct. 698, 77 L. Ed. 1321 [1933]." *State* v. *Echols*, 170 Conn. 11, 13, 364 A.2d 225 (1975).' *State* v. *Gordon*, 197 Conn. 413, 424–25, 504 A.2d 1020 (1985)." *State* v. *Fernandez*, supra. When the rights of those other than the parties are implicated, " ' "[t]he trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice.". . .' " *State* v. *Fernandez*, supra, 11, quoting subdivision (a) of standard 6-1.1 of the American Bar Association Standards Relating to the Administration of Criminal Justice (Special Functions of the Trial Judge [1978]).

The defendant does not provide us with citation of authority nor does our research disclose any authority for the proposition that a crime victim may be excluded from the courtroom upon the defendant's objection to

her presence. In two analogous cases, it was held that a plaintiff had the right to be present during trial, even though bound to a stretcher, and that no deprivation of a fair trial resulted therefrom. See *Wojculewicz* v. *Cummings,* supra; *Antel* v. *Poli,* supra. In *Antel,* the plaintiff, during jury selection, was carried into court on a stretcher while making exclamations of pain that could be heard by everyone in the courtroom. See *Rozbicki* v. *Huybrechts,* 22 Conn. App. 131, 133–34, 576 A.2d 178 (1990), aff'd, 218 Conn. 386, 589 A.2d 363 (1991). In this case, Wright was merely wheeled into court, attended by two nurses and her mother, without incident. The record does not indicate, nor does the defendant claim, that the state said or did anything to bring about her presence in court. Any concern the defendant had about whatever feelings jurors may have felt toward Wright was adequately addressed in the court's instructions to the jury. The court clearly informed jurors that their verdict was not to be influenced by sympathy, sentiment or emotion, but must be arrived at based on their cool and considered application of law to the facts disclosed by the evidence. In the absence of evidence to the contrary, jurors are presumed to follow the court's instructions. *State* v. *Rouleau,* 204 Conn. 240, 254, 528 A.2d 343 (1987); *Klingeman* v. *MacKay,* 25 Conn. App. 217, 220, 594 A.2d 18 (1991). We conclude that denial of the defendant's request to exclude Wright from the courtroom was a proper exercise of the court's power to control the proceedings before it, which safeguarded Wright's obvious interest in the case yet did not impinge on the defendant's right to a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.