[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The defendant, Mary L. Theriault, was charged in a two count Information filed July 12, 1992, with Manslaughter in the First Degree, in violation of Connecticut General Statutes Section 53a-55(a)(3) and Sale of Narcotics, in violation of General Statutes Section 21a-277(a). Trial by jury commenced on July 12, 1993 and the State rested on July 21, 1993.
At the close of the State's case-in-chief, the defendant made a Motion For Judgment of Acquittal pursuant to Connecticut Practice Book 884. Since the defendant represented that she would present no case-in-chief and the evidence was, therefore, closed, the Court treated her motion pursuant to Section 885 of the Practice Book, and reserved decision until after the jury returned its verdict. The jury returned its verdict on July 23, 1993. The defendant was acquitted on the charge of Manslaughter In the First Degree, but convicted on the lesser included offense of Manslaughter In the Second Degree. She was also convicted on Count Two, Sale of Narcotics.
Thus, the defendant's Motion for Judgment of Acquittal is ripe for decision. Having considered the evidence adduced at CT Page 8216-K trial, the oral arguments of counsel and the written pleadings, this Court grants the defendant's motion as to Count One and denies it with respect to Count Two.
THE FACTS
On December 3, 1991, Nicholas Wassil met David Groleau, his life-long friend, between 6:30 and 7:00 P.M. They walked to a building at the corner of Main and Glenn Streets in the City of New Britain, Connecticut, where Wassil rang the doorbell to apartment 205. Someone answered his ring and he went upstairs. Wassil knocked on the door to apartment 205 and was allowed in, just inside the doorway. Wassil asked a woman there whom he knew as "Mary," the defendant, whether she "had any dope," and she told Wassil, "No." However, another woman, an Hispanic, who was standing next to the defendant, stated that she had some. The Hispanic woman handed two $20 bags of heroin to the defendant and she handed them to Wassil. Wassil then handed the defendant $40, which Groleau had given him for the purchase, and she handed it to the Hispanic woman.
Wassil understood that for the $40 he would receive two single dose bags of heroin, at $20 per bag. As of December 3, 1991, Wassil only knew the defendant by her first name of "Mary". While he did not know her last name, he knew her for approximately seven months prior to December 3rd and had seen her around the streets for approximately three years.
After receiving the two packets of heroin from the defendant, Wassil went downstairs and rejoined Groleau, who was waiting for him. They walked to Groleau's parents' apartment on Park Street, arriving at about 7:00 P.M. Groleau's parents were not home. Wassil and Groleau sat down and each drank a couple of beers. Until that time, Wassil had not seen Groleau take any heroin or alcohol. After drinking the beers, Wassil took out a bag of heroin, dissolved it all in a spoon and injected himself with the liquid intravenously with a syringe. Wassil got his usual effect from the heroin. It relaxed him and made him "feel a little high."
At approximately 7:45 P.M., about five minutes after wassil had injected his bag of heroin, Groleau dissolved the other bag of heroin and, using the same needle Wassil had used, injected the heroin into his arm. Within a couple of minutes of taking the heroin, Groleau fell to his knees, CT Page 8216-L remaining there for a few moments before falling to the floor. At this point, he was still conscious and told Wassil that the room was spinning. Wassil attempted mouth to mouth resuscitation but Groleau was still breathing. Wassil tried lifting Groieau up but he could not because Groleau was too heavy.
Wassil unsuccessfully tried calling Groleau's parents. Approximately fifteen minutes after Groleau fell to the floor, Wassil called his friend, Daniel Kiley, and asked him to come over to help him. Kiley arrived within five to ten minutes. Wassil and Kiley lifted Groleau up off the floor and walked him around in an attempt to wake him, but it had no effect. Finally they placed him in the bathtub and ran cold water from the shower over him for a couple of minutes. While he was still breathing, the cold shower had no effect on Groleau either.
After Groleau was placed in the bathtub, Kiley started ransacking the apartment and Wassil told him to leave. Wassil tried to telephone Groleau's parents again but he could not reach them. Wassil returned to the bathroom to look at Groleau and noticed that his lips were turning blue. He then called 911. Groleau's mother came home just after Wassil's call to 911. However, before she or the paramedics arrived, Wassil took some pills which were on Groleau's dresser in his bedroom and the needle which they used to inject the heroin and flushed them down the toilet.
When the New Britain Emergency Medical Services paramedics arrived at the apartment at 8:08 P.M., they found Groleau was not breathing and had no pulse. They commenced C.P.R. and administered medications to restart his heart chemically. In response to their questions, Wassil told the paramedics that Groleau had not taken any drugs. The paramedics were unable to revive Groleau at the apartment so they transported him to New Britain General Hospital at 8:35 P.M. Emergency Room personnel attempted to revive him for twenty-seven minutes but they also were unsuccessful. Groleau was pronounced dead at 8:47 P.M. on December 3, 1991.
An autopsy of Groleau's body was conducted on December 4, 1991, but the cause of death was not determined until March 13, 1992, after a toxicological examination of Groleau's body fluids was completed. Those tests found that Groleau's blood CT Page 8216-M contained 0.20mg per litre of Morphine (Heroin), 0.03mg per litre of Codeine, and 0.06mg per litre of Diazepam or Valium. Ethanol or alcohol was also found at a concentration of 0.18%. Consequently, the final cause of death was noted by the office of the Chief Medical Examiner as "Acute combined Drug Toxicity (Morphine, Codeine, Diazepam, Ethanol)."
Dr. H. Wayne Carver, Chief Medical Examiner for the State of Connecticut, testified that Groleau died as a result of the acute combined toxic effect of the three drugs and alcohol. While a level of .20mg of heroin in the blood, which could be consistent with 5 bags, is not necessarily fatal, the combination of the heroin with the Codeine, Diazepam and alcohol resulted in acute drug toxicity, which caused Groleau's death. In Dr. Carver's opinion, the heroin was a primary and substantial factor in the death of David Groleau. In the words of Dr. Carver, "the Heroin pushed him over the edge."
DISCUSSION
I. Count One: Manslaughter In The Second Degree
With respect to Count One of the Information, the issue before the Court is whether, viewing the evidence in the light most favorable to the State, a jury could reasonably conclude that the defendant is guilty beyond a reasonable doubt of the crime of manslaughter in the second degree. State v. Raguseo,225 Conn. 114, 119, ___ A.2d ___ (1993). More specifically, the Court is asked to decide whether a person who only transfers heroin to another person, who later gives it to a friend who dies as a result of combining the heroin with other drugs and alcohol, can be convicted of manslaughter in the second degree, when the original transferor of the heroin did not know of the decedent and had no knowledge of his physical condition before he injected himself with the fatal dose of heroin.
The defendant urges this Court to adopt New York precedent, to wit, People v. Pinckney, 328 N.Y.S.2d 550 (App.Div. 197 2), affirmed, 297 N.E.2d 523 (N.Y. 1973), and grant her motion for judgment of acquittal with respect to the manslaughter charge. In Pickney, the New York Appellate Division held that the act of selling a dangerous drug, which, when injected with instruments furnished by the seller of the CT Page 8216-N drug, causes the death of the user of the drugs, is not a homicide, and charges for manslaughter in the second degree and criminally negligent homicide were properly dismissed by the lower court. The prosecution in the present case, however, contends that Pickney should not apply because Pickney was based on a New York policy that drug related deaths would not be prosecuted using the homicide statutes and Connecticut has adopted no such policy.
Given the facts of this case and Connecticut law, this Court will not apply People v. Pickney, supra, here. In Pickney, the New York court emphasized that the homicide provisions of New York penal law had no reference to death by the use of dangerous drugs, and stated that, "if the Legislature had intended to include homicide by the selling of dangerous drugs, it would have amended the section of the Penal law relating to homicide." Id. at 554. Apparently, New York has attempted to address this problem by enacting stricter drug statutes, not through its homicide laws. See, Pickney, 328 N.Y.S.2d at 553.[1] In Connecticut, however, neither judicial decision nor legislative fiat suggests the adoption of a policy of excluding deaths resulting from the sale of illegal drugs from the purview of our homicide statutes. In Connecticut, this type of situation may be dealt with both through the homicide and drug statutes.
Turning, then, to Connecticut law, we must resolve the question of whether the defendant's conduct in this case constitutes a violation of our manslaughter in the second degree statute. Connecticut General Statutes Section 53a-56(a)(1) provides that" [a] person is guilty of manslaughter in the second degree when (1) He recklessly causes the death of another person. . . ." "Recklessly" is defined in General Statutes Section 53a-3(13) as follows:
 [a] person acts "recklessly" with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.
CT Page 8216-O
The State must prove, beyond a reasonable doubt, therefore, that the defendant had a subjective realization of a substantial and unjustifiable risk and a conscious decision to ignore it. State v. Jupin, 26 Conn. App. 331, 340,602 A.2d 12 (1992).
Additionally, the defendant's reckless conduct must have been the proximate cause of another person's death. State v. Spates, 176 Conn. 227, 405 A.2d 656 (1978), cert. denied,440 U.S. 922 (1979). Accord, State v. Kwaak, 21 Conn. App. 138,145-146, 572 A.2d 1015, cert. denied, 215 Conn. 811,576 A.2d 540 (1990). Causation has been defined by our Supreme Court as follows:
 "Proximate cause" in the criminal law does not necessarily mean the last act of cause, or the act in point of time nearest to death. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the resulting death. It is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence . . . . It is unnecessary for "proximate cause" purposes that the particular kind of harm that results from the defendant's act be intended by him. In many situations giving rise to criminal liability, the harm that results is unintended, yet is directly or indirectly caused by an act of the defendant. In such cases, where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible.
State v. Spates, 176 Conn. at 233-235 (citations omitted) (footnote omitted).
Viewing the facts of the instant case in the light of the CT Page 8216-P foregoing definition of "proximate cause," the Court finds, as a matter of law, that the evidence is insufficient to establish this necessary element of manslaughter in the second degree. The defendant's only "conduct" in this case consisted of passing two single dose packets of heroin from the Hispanic female to Nicholas Wassil. While this act constitutes a "sale" of narcotics as defined in General Statutes 21a-240(50) and constitutes a violation of Section 21a-277(a), her felonious act was complete when she handed the heroin to Wassil and he left her apartment. The death of David Groleau I was not a probable consequence of the act of furnishing the heroin to Wassil, nor was it one which the defendant reasonably might have anticipated. The natural consequence of the sale of heroin is not death by overdose. The natural consequence of the defendant's act of sale of heroin was that Wassil would consume the drugs himself, as he had done in the preceding seven months in which he had contact with the defendant without incident. There is no evidence to suggest that the defendant reasonably should have foreseen that Wassil would share the heroin with someone who was under the influence of a combination of other drugs and a large quantity of alcohol. Indeed, the defendant had no knowledge of Groleau's physical condition before he injected himself with the heroin or even of his existence.
Furthermore, the defendant did not furnish heroin to David Groleau. Nicholas Wassil did. It was Wassil's reckless and unlawful conduct which caused Groleau's death. Wassil gave heroin to Groleau after they drank some beer, even though Wassil knew that the only times he had overdosed on heroin was when he mixed it with alcohol. Additionally, Wassil's actions after Groleau fell to his knees and told him the room was spinning further contributed to Groleau's death. As Dr. Richard Pinder, Forensic Toxicologist with the Chief Medical Examiner's Office, and Dr. H. Wayne Carver, Chief Medical Examiner, both testified, the level of morphine in Groleau's blood was not necessarily a fatal dose. Moreover, according to Michael Popyk, the New Britain paramedic who was the first to respond to Wassil's 911 call, a person who has overdosed on heroin can be resuscitated if they receive medical attention quickly enough. While Wassil believed Groleau was overdosing on the heroin he had just injected and that is why he and Daniel Kiley walked him around and ran cold water on him in the shower in order to wake him, he did not call 911 until approximately 30 to 45 minutes after Grouleau fell to the CT Page 8216-Q floor and only after he saw Groleau's lips turning blue. David Groleau may not have died had Nicholas Wassil called 911 as soon as Groleau fell to the floor.
Given the totality of Wassil's reckless conduct, the court finds, as a matter of law, the even though the defendant transferred the heroin from the Hispanic female in her apartment to Wassil and it was part of that heroin with which Groleau injected himself, the death of David Groleau was not proximately caused by the defendant's conduct. In light of Wassil's conduct after he left the defendant's apartment, the Court cannot find that Groleau's death followed as a natural, direct and immediate consequence of the defendant's act of furnishing the heroin to Wassil. Rather, Wassil's conduct was an efficient intervening cause which broke the causal connection between the defendant's conduct and Groleau's death. Consequently, the conviction on manslaughter in the second degree cannot stand. Accordingly, the defendant's Motion For Judgment of Acquittal is granted as to Count One.
II. Count Two: Sale of Narcotics
At the close of the State's case-in-chief, the defendant moved orally for judgment of acquittal as to the second count of the Information, arguing, in substance, that the defendant could not be convicted of sale of heroin because the heroin was not hers and she did not receive any money from the transaction. In her brief, however, the defendant did not address Count Two of the Information.
In any event, the Court finds that the State's evidence as to Count Two is sufficient for a jury to reasonably conclude that the defendant is guilty beyond a reasonable doubt of sale of heroin. General Statutes Section 21a-240(50) defines "sale" as ". . . any form of delivery. . .," which includes the defendant's actions in the present case. Accordingly, the defendant's motion is denied with respect to count Two of the Information.
CONCLUSION
This is a case of first impression in Connecticut because it is the first time that the State charged a defendant with manslaughter for a death resulting from the transfer of narcotics, even though the defendant had no connection to the CT Page 8216-R decedent, other than having provided the drug to the person who ultimately gave it to the decedent. With this prosecution, the State wishes to extend criminal liability for a homicide to anyone who transfers narcotics and death by overdose results, regardless of the circumstances which might have intervened between the transfer and the death. The State argues that anyone who sells illegal drugs properly should be held criminally responsible for any death by overdose of those drugs, because narcotics are so inherently dangerous that putting them into circulation is akin to someone firing a gun into a crowd and killing someone. The State's argument, however, misses the mark. In the instant case, the defendant's conduct would be comparable, not to that of the person who fired the gun into the crowd, but rather, to the person who sold the gun originally and who had no knowledge of its subsequent transfer.[2] In the present case, Nicholas Wassil would be analogous to the person who fired the gun into the crowd, not the defendant.
While it cannot be disputed that sale of narcotics is conduct which society should condemn and law enforcement should vigorously pursue, under the facts of this particular case, the connection between the defendant's transfer of the heroin to Wassil and the death of David Groleau is simply too tenuous to support the defendant's conviction for manslaughter. Nicholas Wassil's conduct broke the chain of causation between the defendant's conduct and David Groleaus's death, so that the defendant's conviction for manslaughter cannot stand.
Accordingly, for all the foregoing reasons, the defendant's Motion For Judgment of Acquittal is granted as to Count One and denied as to Count Two of the Information.
IT IS SO ORDERED.
Dated at Hartford, Connecticut, this 7th day of October, 1993.
BY THE COURT, Carmen E. Espinosa, J.